STATE OF CONNECTICUT          :      3:17mj1854(CSH)
:
:     ss: CITY OF NEW HAVEN
:
COUNTY OF NEW HAVEN       :

FILED
2017 NOV 29. PM 4 01
U.S. DISTRICT COURT
NEW HAVEN. CT.

## AFFIDAVIT

Christopher Zullo, being duly sworn, deposes and states the following:

1.   I am a Task Force Agent assigned to the Connecticut Joint Terrorism Task Force ("JTTF"), and have served on the JTTF for approximately five months. For approximately 10 years, through and including the present, I have also served as a full time member of the Connecticut State Police. I presently have the rank of Detective, and am assigned to the Connecticut State Police Office of Counter Terrorism. Prior to my service with the Office of Counter Terrorism I was assigned for approximately four and a half years to the Western District Major Crime Squad. I have investigated numerous criminal offenses, including but not limited to narcotics offenses, crimes of violence, and homicides. I have served as an affiant for numerous search and seizure and arrest warrants, and I have participated in the execution numerous search and arrest warrants.

2.   I submit this Affidavit in support of an application for a warrant to search the residence of Kenneth Zrallack, located at 100 Howard Ave., Ansonia, CT, including Kenneth Zrallack's laptop computer and all related computer storage media, as more particularly described in Attachment A, for evidence, fruits, and instrumentalities of the violations of federal criminal law identified herein, as more particularly described in Attachment B.

3.   The statements contained in this Affidavit are based upon my training and experience, personal knowledge, review of documents in this case, and information provided by a Confidential Human Source and by other law enforcement personnel involved in this investigation. Because this

Affidavit is being submitted for the limited purpose of establishing probable cause to issue a warrant to search one residence, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth herein only those facts that I believe are necessary to establish that probable cause exists to support the issuance of the search warrant.

### Summary

4.   Since approximately November of 2008, the New Haven FBI has been conducting an investigation of certain members of the Connecticut White Wolves ("CWW") and its successor entity, Battalion 14, both of which are self-described white supremacist organizations, for criminal violations that include, among others, conspiracy to violate the National Firearms Act, 26 U.S.C. §§ 5861(f), (d), and (e), in violation of 18 U.S.C. § 371, and firearms possession by, and firearms transfer to, convicted felons, in violation of 18 U.S.C. §§ 922(g)(1) and 922(d)(1).   Several investigative tools have been utilized in this investigation, including the participation of a Confidential Human Source ("CHS").   In sum, the investigation has gathered evidence of actual and attempted firearms and explosives trafficking by certain CWW/Battalion 14 members and their associates.   Among other things, the investigation has gathered evidence showing that KENNETH ZRALLACK, who was and is the leader of CWW/Battaion14, had knowledge of the transactions involving firearms and explosives; was notified on multiple occasions that such transactions were being planned; agreed to accept cash payoffs from such transactions in the event the firearms/explosives sales were completed; and on two occasions after such transactions had in fact occurred, KENNETH ZRALLACK did accept cash payments that were understood to be part of the payments for the purchases of firearms and explosive grenades.   The investigation also gathered

evidence that among the coconspirators to these events, it was understood that such firearms and explosives were intended for ultimate delivery to an out-of-state white supremacist group.

## Pertinent Facts

5.   Since the late fall of 2008, the CHS has participated in CWW/Battalion 14 meetings, and has gotten to know several members of CWW/Battalion 14.  The CHS has held himself out as a white supremacist and a member of an out-of-state white supremacist group known as the Invisible Knights of America ("IKA").  The CHS discussed his IKA involvement with, among others, KENNETH ZRALLACK and ALEXANDER DEFELICE.  The CHS has also represented that his IKA connections were interested in obtaining firearms.  The CHS is a previously convicted felon, and has identified himself as a previously convicted felon on several occasions to CWW/Battalion 14 members and participants, including among others, KENNETH ZRALLACK, ALEXANDER DEFELICE, WILLIAM R. BOLTON, and EDWIN T. WESTMORELAND.

6.   The CHS has identified the leader of CWW/B14 as KENNETH ZRALLACK ("ZRALLACK").  According to the CHS, ZRALLACK keeps track of the membership and holds the dues payments in a safe at his residence.  At one CWW/Battalion 14 meeting attended by the CHS, the members decided that monthly membership fees would be $20.00 for individuals and $35.00 for couples.  At another meeting attended by the CHS, the group elected ZRALLACK to be the leader of a new Connecticut chapter of a regional white supremacist organization known as New England White Pride, or "NEWP."

7.   ZRALLACK's employment is understood to be in construction, and does not involve an office space or a work computer.  The CHS has met with ZRALLACK at the latter's residence, located at 100 Howard Avenue in Ansonia, CT.  The CHS reported that ZRALLACK occupies the

basement apartment of the multi-family house at that address. The CHS has observed that ZRALLACK has one roommate who lives in a bedroom in the apartment. The CHS has observed ZRALLACK using a laptop computer in that residence, and says that ZRALLACK spends a large amount of time on the computer. The only computer that the CHS has observed in the residence is the laptop used by ZRALLACK. Among other things, ZRALLACK has used the computer to make numerous postings via the internet on the NEWP website, using a pseudonym in his posts.

8.   In early 2009, a CWW/Battalion 14 member named ALEXANDER DEFELICE ("DEFELICE") indicated that he could obtain and sell firearms to the CHS for the CHS's "people". Prior to 2009, DEFELICE was convicted in the Superior Court of the State of Connecticut of multiple felony offenses, including Burglary in the Third Degree, Failure to Appear, and Weapon in Motor Vehicle. In several discussions with the CHS, DEFELICE expressed an interest in and knowledge of both firearms and explosives, stating that he had the ability to make and deploy homemade explosives, and that he was writing a book about improvised explosive devices.

9.   Over several weeks, DEFELICE discussed with the CHS various ways of providing one or more firearms to the CHS. On at least one such occasion, while the CHS was at DEFELICE's residence, DEFELICE displayed a rifle that he was keeping inside the residence – despite DEFELICE's convicted felon status. These discussions culminated on the evening of March 9, 2009, when DEFELICE and two other individuals negotiated and conducted a sale to the CHS of DEFELICE's rifle, immediately prior to which sale they sawed off the barrel (the weapon was referred to as a "shotgun" throughout the evening, but in fact it turned out to have a rifled barrel). The other two individuals have been identified as WILLIAM R. BOLTON ("BOLTON"), whom the CHS has described as DEFELICE's brother; and EDWIN T. WESTMORELAND

-4-

("WESTMORELAND").  Throughout the events of March 9, 2009, the CHS was wearing a concealed audio/video recorder and transmitter, so that the events were recorded on audio/video, and were contemporaneously monitored on audio by the agents conducting surveillance nearby.  Before the rifle sale was concluded, and with DEFELICE, BOLTON, and WESTMORELAND all close by and appearing to be listening, the CHS stated (among other things) that he was a convicted felon and could not register a firearm.  After the sale had been discussed and DEFELICE had offered to have the rifle barrel sawed off, DEFELICE instructed BOLTON to go with the CHS to a nearby Home Depot to purchase saw blades, which they did.  After BOLTON and the CHS returned and the rifle barrel was sawed off, DEFELICE sold the rifle to the CHS for $300 cash.  Around the time of the transaction, DEFELICE expressed frustration that the CHS's customers were seeking assurances that the weapon was not traceable, shouting "These are people from the f–in Ku Klux Klan . . . [a]nd they don't know that a f–in shotgun ain't traceable?"  After the transactions, DEFELICE instructed BOLTON and WESTMORELAND to throw out the sawed-off barrel over the Devon Bridge in Milford.  One of the men then told the CHS to "[g]et the f—k out of here with that gun," after which DEFELICE stated, "[y]eah, 'cause that's like a federal felony right now."  The CHS then left the residence with the weapon.  Under FBI surveillance, the CHS drove back to FBI New Haven headquarters, where the CHS turned over the weapon, the audio/video equipment, and the remainder of the $1,000 cash that he had been provided for the weapon purchase.  The weapon turned out to be a single-barrel, 20 gauge Mossberg rifle.

    10.  On or about March 23, 2009, the CHS received a phone call from DEFELICE requesting a meeting.  Although DEFELICE resides in Milford, he indicated that he was in Hamden, and requested that they meet in Hamden, in a parking lot near a Kohl's Department Store located on

Dixwell Ave.  At about 1:00 p.m., the CHS met DEFELICE in that parking lot.  DEFELICE had arrived alone in a black Chevrolet SUV.  DEFELICE told the CHS that DEFELICE had something the CHS's "people" would be interested in.  As noted above, the CHS had on prior occasions advised DEFELICE that the CHS sought to obtain firearms on behalf of certain members of a white supremacist organization located outside Connecticut.  DEFELICE stated he had an associate who would help DEFELICE sell military style hand grenades, flash bombs, mines, and rocket launchers, and explained that this associate had prior military experience.  After the CHS contacted an FBI agent by telephone, and obtained approval to agree to purchase such items, the CHS advised DEFELICE that the CHS and his people were interested in making such purchases.

11.  On Thursday, May 28, 2009, DEFELICE called the CHS and reported that DEFELICE had obtained something related to the fusing of a bomb that he had in his safe at his house. DEFELICE indicated that the CHS would be very interested in this for the CHS's "people."

12.  Owing to certain scheduling and logistical issues in the investigation, the CHS's opportunities to follow up on DEFELICE's offer to broker a sale of explosive materials were limited for much of the summer of 2009.  Nonetheless, on July 28, 2009, DEFELICE confirmed in a recorded conversation with the CHS that DEFELICE's "people" were still willing to do a transaction involving explosive materials.  In a recorded conversation on July 30, 2009, DEFELICE reiterated that he had an associate who could do the transaction, who resided in Hamden.  On multiple occasions in September of 2009, DEFELICE reassured the CHS that he was still interested in brokering a sale of explosives to the CHS, and that DEFELICE's associate remained willing to supply such explosives.  During one such conversation, DEFELICE advised the CHS that, in order

to do the deal, the CHS would need to provide empty hand grenade cases, which DEFELICE's associate would then convert into live grenades.

13.   On October 1, 2009, under close supervision and monitoring by the FBI, and recorded on audio/videotape, the CHS met with DEFELICE at DEFELICE's residence.  In DEFELICE's garage, the CHS provided DEFELICE with three empty hand grenade cases as requested by DEFELICE.

14.   For reasons that were not always made clear to the CHS, the assembling of the grenades was repeatedly delayed.  Meanwhile, DEFELICE continued to express an interest in doing other transactions with the CHS.  In October of 2009, DEFELICE sold the CHS a bulletproof vest for $1,000.

15.   On November 3, 2009, the CHS met with ZRALLACK at the latter's residence, where they discussed several topics including DEFELICE's unpaid, $3,000 debt to ZRALLACK, DEFELICE's sale of the military vest to the CHS, and DEFELICE's failure to share any of the vest sale proceeds with ZRALLACK to help pay down the debt.  ZRALLACK and the CHS agreed that DEFELICE should share with ZRALLACK some of the proceeds of his transactions with the CHS. ZRALLACK also discussed the CHS's status as a convicted felon, advising the CHS that he cannot possess a firearm, ammunition, or even a knife.  These conversations were recorded.

16.   On November 11, 2009, DEFELICE and WESTMORELAND sold a rifle and a shotgun to the CHS.  The latter transaction, which was recorded on audio/videotape, proceeded as follows. Shortly after 7:00 p.m., the CHS met DEFELICE at the latter's Milford residence.  Amidst various discussions and phone calls, DEFELICE advised that he had arranged a sale of two rifles to the CHS. The CHS paid DEFELICE approximately $1,000 to purchase the two weapons.  Eventually the two

men got into the CHS's car, and DEFELICE directed the CHS to drive to WESTMORELAND's residence in Stratford, Connecticut.  At that residence, WESTMORELAND and DEFELICE sold a rifle and a shotgun to the CHS, and DEFELICE passed a portion of the cash to WESTMORELAND.  The weapons were placed in the CHS's car trunk.  Around the time of the transaction, the CHS mentioned his status as a convicted felon, and asked whether he could "get in trouble for having this in my car."  While driving away from the scene of the transaction, the CHS expressed his reluctance to drive around with the weapons in the car, and DEFELICE offered to store them in the garage of his residence.  After dropping DEFELICE off at his residence, the CHS met up with agents from the FBI, who examined the rifle ans shotgun in the car trunk.  Upon visual examination, they both appeared to be fully operable firearms.

      17.  While the CHS's trunk was open, the agents and the CHS placed an envelope containing $300 cash directly on top of the two firearms.  Surveilled by the agents, the CHS then drove to a pre-arranged meeting with ZRALLACK in the parking lot of a Dunkin Donuts in Milford.  When the met, the CHS opened the car trunk, showed ZRALLACK the weapons, and handed ZRALLACK the cash-filled envelope.  While the trunk was open, the following exchange was recorded:

| | |
|---|---|
| CHS | Nah.  Look, you didn't see nothin.  See (UI), you didn't see nothin'.  (Sound of trunk slamming shut)  It's a start.  Come, I'll show you now, it's not what you– I know he owes you 3 grand (UI), it's not 3 grand but– (pause) You never got that |
| ZRALLACK | That's cool |

The CHS and ZRALLACK then discussed how DeFelice repeatedly promised to pay Zrallack himself, but failed to actually make such payments.

18.  On November 17, 2009, the CHS advised ZRALLACK by telephone that the CHS was supposed to have something "set up" again with DEFELICE to obtain "whatever I can get before the holiday comes," and asked ZRALLACK whether he should bring money "like we did last time." ZRALLACK replied, "we can do it like last time."  This conversation was recorded.

19.  On December 23, 2009, the CHS telephoned ZRALLACK to report that he was going to "swing by Alex's," and that "I'm workin on something with him, so if everything goes, everything works out, . . . I should have money by maybe Monday, Tuesday at the latest."  ZRALLACK replied, "That'd be sweet."  This conversation was recorded.

20.  Also on December 23, 2009, the CHS met with DEFELICE at the latter's Milford residence, and discussed the making of the explosive grenades.  DEFELICE directed the CHS to drive him to a Home Depot store and a Napa Auto Parts store, both located in Stratford, Connecticut, where he shopped for tools needed to make the explosive grenades.  The CHS returned with DEFELICE at the latter's residence, where DEFELICE continued to work on making the explosive grenades.  These incidents were recorded on audio and video.

21.  Through late December of 2009 and January of 2010, DEFELICE and the CHS continued to have discussions and meetings about the making and sale of explosive grenades.  On or about January 10, 2010, DEFELICE and WESTMORELAND, joined by the CHS, delivered the three grenade cases to the residence of DEFELICE's associate who DEFELICE claimed was going to finish making the grenades.  Apparently this did not happen, because on January 23, 2010, DEFELICE notified the CHS that they needed to retrieve the grenade cases from that location. DEFELICE and the CHS drove to the residence, where DEFELICE got out, walked up to the outside of the person's residence, and retrieved a box containing the cases for the still unassembled grenades.

-9-

22.   Later that same day, January 23, 2010, the CHS, DEFELICE, and WESTMORELAND met up at DEFELICE's residence.  The CHS excused himself and arranged to meet with the case agents, who outfitted him with the concealed audio/video equipment.  When the CHS returned to DEFELICE's Milford residence, DEFELICE and WESTMORELAND were still there, having almost finished the grenades' assembly.  DEFELICE advised that WESTMORELAND had cut open several shotgun shells to extract powder for the grenades, and WESTMORELAND said that he had previously purchased the shells at a shooting range.  With the three grenades being completed for delivery, the CHS paid DEFELICE $3,000 cash, and DEFELICE gave a small portion of the cash to WESTMORELAND, who then left.  Later that same day, and in the presence of the CHS, DEFELICE completed the assembly of the three grenades at his residence.  Before finishing the job, DEFELICE telephoned ZRALLACK and told him that "We, ah, got some cash comin' your way from both of us," then concluded the conversation with the phrase, "All right brother. 88."  Agents with knowledge and investigative experience in white supremacist groups have advised that "88" is code talk for "HH" (because H is the 8th letter of the alphabet), that is, "Heil Hitler."  DEFELICE placed the finished grenades in a cardboard box displaying a hand-drawn Swastika.  Before conveying the finished grenades to the CHS, DEFELICE also gave the CHS a sealed envelope that he said contained $250 for ZRALLACK.

23.   After DEFELICE gave the CHS the three, finished explosive grenades, the CHS left DEFELICE's Milford residence and, surveilled the entire way by FBI agents, drove to a pre-arranged meeting location with FBI agents.  There the CHS turned the three explosive grenades over to the supervising FBI agents.  The CHS then continued on to Ansonia, where he met with ZRALLACK at the latter's residence, discussed the explosive grenades transaction, and gave ZRALLACK the

-10-

envelope with cash that was understood to be part of the purchase money for the explosive grenades. The CHS also shared a drink with ZRALLACK, during which ZRALLACK, prompted by a female friend who was present, and joined by WITNESS A, called out "88," code for "Heil Hitler."

24.     FBI agents, including a Special Agent Bomb Technician, conducted a visual examination of the grenades, which indicated that they were indeed functional explosives.  On February 28, 2010, FBI agents executed a court-authorized warrant to search DEFELICE's Milford residence, where they found and seized, among other things, over 100 cut shotgun shells, and two bowls containing, respectively, powder consistent with shotgun shell powder, and several lead shots. The agents conducted a burn test with a small quantity of the powder, and it immediately combusted. The three grenades have been submitted to the FBI headquarters laboratory in Quantico, Virginia, for further forensic testing.

25.     The visual search of the three grenades also confirmed that all three lacked a manufacturer's name, a manufacturer's address, and a serial number.  An agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") arranged to have the names of ZRALLACK, DEFELICE, BOLTON, and WESTMORELAND run through the National Firearms Registration and Transfer Record ("NFRTR"), which lists all persons who have obtained the Attorney General's approval to make and transfer firearms consisting of explosive devices, and all persons who have paid the tax due on the making and transfer of such devices, as is required by 26 U.S.C. Chapter 53. None of the names appeared in the NFRTR.

**Conclusion**

26.  Based upon the foregoing, I submit that there is probable cause to believe, and I do believe, that in violation of 18 U.S.C. § 371, KENNETH ZRALLACK and others have knowingly and willfully participated in, benefitted from, and sought to benefit from a conspiracy to unlawfully obtain, make, sell, and transfer firearms to the CHS, involving the sale and transfer of rifles and shotguns to the CHS, knowing and having reasonable cause to believe that the CHS had been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 922(d)(1), and involving the making and transfer in violation of the National Firearms Act, 26 U.S.C. Chapter 53, of firearms consisting of explosive grenades, in violation of 26 U.S.C. §§ 5861(f) and (e).

27.  Also based upon the foregoing, I submit there is probable cause to believe, and I do believe, that there exists at the residence of KENNETH ZRALLACK, including on his laptop computer and any related computer storage media, as more particularly described in Attachment A, evidence, fruits, and instrumentalities of the foregoing criminal conspiracy, as more particularly described in Attachment B.  Among other things, I submit there is probable cause to believe that in KENNETH ZRALLACK's Ansonia residence and on his laptop computer and any related computer storage media, there exists among other pertinent items, evidence of both his association with and leadership role in relation to the co-conspirators, including but not limited to membership, dues, and other records of CWW/Battalion 14 and the Connecticut branch of New England White Pride, as well as communications with, and/or direction given to, the coconspirators about various matters of common concern.  I also submit there is probable cause to believe that in KENNETH ZRALLACK's Ansonia residence and on his laptop computer and any related computer storage media, there exists

-12-

among other pertinent items, evidence of his motive and intent relevant to the conspiracy's goal of delivering/selling the firearms and explosive grenades to one or more out-of-state white supremacist groups, in the form of communications, records, and plans regarding transactions and relationships with such out-of-state groups, including but not limited to the Invisible Knights of America, and material concerning the making, acquiring, possession, use, transfer, and sale of firearms and explosive devices.

28.   I therefore request that a search warrant be issued to search the residence of KENNETH ZRALLACK, including his laptop computer and any related computer storage media, more fully described in Attachment A, for the items listed in Attachment B.

### Execution of the Warrants as to Computer Systems and Storage Devices

29   Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, and passwords which are (1) instrumentalities, fruits or evidence of a crime, or (2) storage devices for information about a crime.

30.   Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I know that electronic data can be stored on a variety of computer systems and storage devices. I also know that during the search of the premises, it is rarely possible to complete an on-site examination (and in some cases even images) of computer systems and storage devices for a number of reasons, including the following:

a.   Imaging and forensic analysis of computer systems and storage devices is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is rarely possible to bring to the location where the warrant is to be executed all of the necessary technical manuals and specialized equipment necessary to conduct a thorough analysis. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, operating system, or software application being analyzed.

b.   The analysis of computer systems and storage devices often relies on rigorous procedures designed to maintain the integrity of the evidence and to recover "hidden," mislabeled, deceptively-named, erased, compressed, encrypted, or password-protected data, while reducing the likelihood of inadvertent or intentional loss or modification of data. A controlled environment, such as a law enforcement laboratory, is typically required to conduct such an analysis properly.

c.   The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to analyze (or at times image) the data during the execution of the physical search of the premises. The hard drives commonly included in mere desktop computers are capable of storing millions of pages of text; the storage capacity of servers is often much greater.

31.   Due to the volume of data at issue and the technical requirements set forth above, it may be necessary for the above-referenced computer systems and storage devices to be seized and analyzed subsequently by a qualified computer specialist in a laboratory setting. Under certain circumstances, however, some types of computer systems and storage devices may be imaged and a copy of the data may be seized, thus eliminating the need for its removal from the premises. A

determining factor is whether a particular device can be more readily, quickly, and thus less intrusively, analyzed off-site, with due consideration given to preserving the integrity of the evidence. This, in turn, is often dependent on the size of the computer systems and storage media to be analyzed; and this is frequently dependent upon the particular type of computer system or storage device involved.

32.   Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I am aware that forensic analysis of computer systems and storage devices taken from the premises commonly requires agents to seize most or all of a computer system and storage devices, in order for a qualified computer expert to retrieve the data accurately in a laboratory or other controlled environment. Therefore, in those instances where computer systems and storage devices are removed from the premises, in order to retrieve data properly, the agents must seize all of the computer systems and storage devices. If, after imaging and inspecting the computer systems and storage devices, it becomes apparent that these items are no longer necessary to retrieve and preserve the data as evidence, and are not otherwise seizeable, such equipment and/or materials will be returned within a reasonable time.

33.   Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I am aware that the analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying the file directories and any individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized for seizure by the warrant);

-15-

conducting a file-by-file review of the data; examining all the structured, unstructured, deleted, and free space data on a particular piece of media; opening or reading the first few pages of each file in order to determine their precise contents; scanning storage areas to discover and possibly recover deleted data; scanning storage areas for deliberately hidden files; and performing electronic key-word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation. The forensic analysis of the electronic information seized during the search can take weeks or months, depending on the volume of data stored in the computers.

<u>**Request to Seal**</u>

34. I believe that placing this Affidavit or the existence of the requested search warrant in the public domain at this time would seriously jeopardize the ongoing investigation described above, as well as the safety of the CHS. Allowing the subjects of this investigation to know of the government's investigation as described herein, and to know of the status and role of the CHS as described herein, will furnish powerful incentives for the subjects to secrete and/or destroy evidence of their possession, manufacture, and/or transfer of firearms and explosives before the government has the opportunity to attempt the search sought herein. Also, making such information accessible to the subjects will furnish powerful incentives for them to attempt to harm and/or intimidate the CHS and/or members of the CHS's family, whose address the subjects know. Accordingly, I request

-16-

that this Affidavit, and the application and warrant, be kept under seal until further order of the

Court, except that law enforcement agents who will assist in the searches be permitted to have and/or

review copies of same.

CHRISTOPHER ZULLO
Task Force Agent
Federal Bureau of Investigation

Subscribed and Sworn before me this 19 TH day
of March, 2010, at New Haven, Connecticut

/s/ Judge Charles S. Haight

HON. JOAN G. MARGOLIS
SENIOR UNITED STATES DISTRICT JUDGE

ATTACHMENT A

Residence to be Searched

Residence of Kenneth Zrallack at 100 Howard Avenue, Ansonia, CT.  The residence is located at 100 Howard Avenue, Ansonia, CT.  100 Howard Avenue is a white, multi-family, three story house with the number "100" on the front of the residence.  The residence of Kenneth Zrallack consists of the basement apartment.  There are two entrances to Zrallack's basement apartment: one on the south side of the residence, and another on the east side of the residence.  The scope of the search is to include the laptop computer used by Kenneth Zrallack, and all computer storage media used by Kenneth Zrallack or associated with Kenneth Zrallack's laptop computer.

ATTACHMENT B
Items to be Seized

1.     All evidence of KENNETH ZRALLACK's association with and leadership role in relation to the co-conspirators ALEXANDER DEFELICE, WILLIAM R. BOLTON, and EDWIN T. WESTMORELAND, including but not limited to:  membership, dues, and other records of CWW/Battalion 14 and the Connecticut branch of New England White Pride; indications of KENNETH ZRALLACK's leadership role in any such organizations; and communications with, and/or direction given to, the coconspirators about various matters of common concern.

2.     All evidence that KENNETH ZRALLACK, and/or the co-conspirators ALEXANDER DEFELICE, WILLIAM R. BOLTON, and EDWIN T. WESTMORELAND sought to make, acquire, possess, use, transfer, and/or sell firearms and/or explosive devices, including but not limited to, firearms/explosives and/or parts or precursor chemicals and materials for same; manuals, books, magazines, notes, and any other materials in hard copy; or such items in any form of text, video, e-mail or other computer/magnetic stored material, or history of websites visited, bookmarked, and/or downloaded, all concerning the acquisition, possession, use, transfer, and/or sale of firearms and/or explosive devices.

3.     All evidence that KENNETH ZRALLACK, and/or the co-conspirators ALEXANDER DEFELICE, WILLIAM R. BOLTON, and EDWIN T. WESTMORELAND sought to negotiate or conduct transactions involving firearms/explosives or other items with, and/or develop, maintain, or expand relationships with out-of-state white supremacist groups, including but not limited to the Invisible Knights of America, the Ku Klux Klan, New England White Pride; and such evidence to consist of any and all formats including but not limited to notes, correspondence, and any other materials in hard copy; or in any form of text, video, e-mail or other computer/magnetic stored material, or any history of websites visited, bookmarked, and/or downloaded.